65 So.2d 845 (1953)
FLETCHER
v.
STATE.
Supreme Court of Florida, Special Division B.
June 9, 1953.
Talton Branch, Tampa, and M.H. Jones, Clearwater, for appellant.
Richard W. Ervin, Atty. Gen., and William A. O'Bryan, Asst. Atty. Gen., for appellee.
MATHEWS, Justice.
The appellant was found guilty by a jury, of the Circuit Court of Pinellas County, on the third count of an information which charged that the defendant "was interested in and connected with a lottery or lottery drawing, commonly known as bolita, for money, in that he received, collected and transported money and records of the sale of chances on a lottery; contrary * * *." Final judgment was entered based upon the verdict, new trial was denied and the appellant appeals.
It is urged by the appellant that the count upon which he was convicted charged a misdemeanor and not a felony and, therefore, the Circuit Court was without jurisdiction.
There was created in Pinellas County a Civil and Criminal Court of Record by Chapter 27258, Laws of Florida 1951, with jurisdiction to try all misdemeanor cases arising in the county. If the count charges a misdemeanor and not a felony, then the Circuit Court of Pinellas County had no jurisdiction and the case should be reversed.
In 1951 the lottery statutes were amended and redrafted. By Section 849.09, F.S., as amended, F.S.A., some offenses in connection with lotteries were denominated misdemeanors and others denominated felonies. Section 849.09, F.S., as amended, F.S.A., which is Section 1 of Chapter 26765, Laws *846 of Florida 1951, provides, among other things, as follows:
"(a) It shall be unlawful for any person in this state to:
* * * * * *
"(4) Aid or assist in the setting up, promoting or conducting of any lottery * * * drawing, whether by writing, printing or in any other manner whatsoever, or be interested in or connected in any * * * lottery or lottery drawing; or
* * * * * *
"(7) Sell, offer for sale, or transmit, in person or by mail or in any other manner whatsoever, any lottery ticket, coupon, or share, or any share in or fractional part of any lottery ticket, coupon or share, whether such ticket, coupon or share represents an interest in a live lottery not yet played or whether it represents, or has represented, an interest in a lottery that has already been played; or
* * * * * *
"(b) Any person who is convicted of violating any of the provisions of paragraphs (1), (2), (3), or (4) of subsection (a) of this section shall be punished by imprisonment in the state prison for not less than one year nor more than five years." F.S.A. § 849.09(1) (d, g), (2).
The appellant's contention is that the court does not charge a felony because after charging that the appellant "was interested in and connected with a lottery or lottery drawing, commonly known as bolita, for money," the count contained the additional words "in that he received, collected and transported money and records of the sale of chances on a lottery." There can be no question that the charge that the appellant "was interested in and connected with a lottery or lottery drawing, commonly known as bolita, for money," is covered by F.S. §§ 849.09(a) and 849.09(4), F.S.A., but the appellant urges that the additional words, "in that he received, collected and transported money and records of the sale of chances on a lottery," constitute a misdemeanor and is covered by F.S. § 849.09(7), F.S.A.
It may be that the appellant's contention would be correct if the count was limited to the charge that he had transported a "lottery ticket, coupon, share or fractional part of any lottery." We cannot divide the count into pieces. We must construe the count as a whole. The count also charges that the appellant "was interested in and connected with a lottery for money" and then goes further and alleges what he did by saying "in that he received, collected and transported money and records of the sale of chances on a lottery * * *." The count was sufficient to charge a felony. Strachaan v. State, 116 Fla. 736, 156 So. 885; Brady v. State, 150 Fla. 122, 7 So.2d 348; Pinkney v. State, 160 Fla. 884, 37 So.2d 157.
It is next urged that the Court committed error in admitting certain testimony over the objections and motions of the appellant because there was no search warrant and the evidence was secured, either by an illegal search or as the result of, or in connection with, an illegal arrest.
Two officers of St. Petersburg, Harry F. Dietrich, a policeman, and John S. Siers, a deputy Sheriff, each qualified as to his long service in making investigations and arrests concerning bolita operations and each was thoroughly familiar with the details of the operation. Each had gained peculiar knowledge, as such officers, of the manner and method in which lottery tickets were sold and the operation was conducted.
Testimony of the officers shows that there was a housing project in St. Petersburg (a likely place to sell bolita) and for some time the appellant had been under investigation and surveillance. The officers had a right to watch the appellant (but not arrest or search him) if they believed that he was a violator of the lottery law. Officers have the right to watch or observe anyone. While the appellant was under investigation and surveillance, the officers stationed themselves in the vicinity of the housing project. Soon thereafter the appellant came from the housing project and entered his car, which was parked on the street. The officers knew the number of the license tag and were watching for the appellant and were watching the car. As *847 the appellant entered his car, the officers drove up and stopped near him. Before they arrested him or ordered him from his car and before either of them entered or touched his car in any way, they saw a pad of paper slips protruding from his shirt pocket. They also saw on the paper slips written numbers and opposite the numbers an amount of money. Without touching the car or entering it, they saw other pads on the seat. These other pads were of the kind on which lottery tickets were written. On the floor of the car was still another pad of papers of the type which they knew, from their experience, prior observation and knowledge, were used in making lottery tickets. All of the papers and the writing thereon were clearly and plainly visible to the officers prior to the time they made any arrest and before they undertook to make any search of the appellant or his automobile. After seeing these things they then arrested the appellant, took the tickets which he had in his shirt pocket and the pads on the seat and the tickets on the floor of the car. They then searched the appellant and found quite a quantity of money.
Under the above facts and circumstances as shown by the record in this case, the officers were justified in arresting the appellant for a crime committed in the presence of such officers. The officers saw with their "naked" eyes the lottery tickets on the person of the appellant and the additional lottery tickets and pads lying openly and in plain view in the automobile. See Diaz v. State, Fla., 43 So.2d 13; Rogers v. State, 158 Fla. 582, 30 So.2d 625. The arrest and the search, which followed, were legal.
The appellant relies upon the case of Graham v. State, Fla., 60 So.2d 186. There is no similarity between that case and the case at bar. In the case of Graham v. State, supra, the operator of a motor vehicle was arrested on an alleged traffic violation and thereafter the search of the driver and vehicle followed. This Court held that there was no evidence of a violation of the traffic laws and that the arrest and search incident thereto was unlawful. See also Collins v. State, Fla., 65 So.2d 61, Petition for Rehearing denied April 29, 1953.
Our conclusion in this case is controlled by the cases hereinabove cited and the more recent case of Rodriguez v. State, Fla., 58 So.2d 164, 165, wherein this Court said:
"As to question number (1), the appellant developed on cross-examination that the officers had reasonable grounds to believe that a felony had been, or was being, committed in the place in question, and based upon this information they went to the place and without any seizure or search, saw the appellant with a pencil in his hand, pads on the counter immediately in front of him and then made the arrest. This arrest was legal. These officers with the information which they had and being thoroughly familiar with lottery operations, had reasonable grounds to believe that a felony was being committed when they saw the appellant with a pencil in his hand and bolita pads immediately in front of him on the counter. They saw the lottery tickets and after the arrest they seized them and made such search as was necessary to find the money and seized the money near the scene of operations. The arrest and whatever search and seizure resulted were legal, and the Court did not commit error in refusing to grant the motion to suppress the evidence. See Diaz v. State, Fla., 43 So.2d 13; Brown v. State, Fla., 46 So.2d 479; and Italiano v. State, 141 Fla. 249, 193 So. 48."
During the progress of the trial, one of the officers, who was a witness for the State, was testifying and the prosecuting attorney asked the witness several questions concerning statements made by the appellant to him (the officer). It developed that one of the officers asked the appellant how long he had been working for Mr. Adams, and the appellant answered, "`Oh, I don't know.'" The attorney for the appellant objected to this question and answer "unless it is shown that it would prove the issues in this particular case." The Court overruled the objection, and the following proceedings were had:

*848 "Q. Do you know Mr. Adams that was referred to there, do you know what * * *. A. Yes, sir.
"Q. What is his full name? A. Lovick Adams.
"Q. All right, and his answer was that he didn't know? A. He said, `I don't know, Captain', and Captain Siers said, `What do you mean?', * * * and Jack says, `Well, Captain, it's this way: I'm just like the rest of the poor niggers, I'll admit I was in selling. I was selling that for myself, you got me, that cuban; I know I'm in trouble.', and that's all he would say."
Prior to the trial the officers had another conversation with the appellant which was testified to by Officer Dietrich. Dietrich testified that he did not use any force, threat or coercion against the appellant, or offer him any reward or hope of reward with reference to anything the appellant might say. He further testified that any statement made by the appellant or any question answered was made and done in a free and voluntary manner. Thereafter Dietrich testified as follows:
"A. At that time we asked Jack if he wanted to come up to Clearwater and tell the truth about his work. He said no, that he was afraid, he couldn't do it, he was in a way, afraid of Mr. Adams and he said he wouldn't feel right if he did that thing. So, we asked Jack, in conversation, `Jack, how long have you been working for Mr. Adams?', and he said, `Well, Captain, it's been a long time,' in fact, back the last election he had associated with Mr. Adams. We asked him how many places he picked up and he said, `Six'. We asked him where he contacted Mr. Adams when he checked in and he said various places, but mostly at First Avenue South at approximately 17th Street; that would be on the west side of Pinellas Lumber Company. We asked him how he paid off. He said Mr. Adams would meet him at a later time at the place designated by him and he would get the money from Mr. Adams and he would pay off.
"Q. Now, by `pick up', what do you mean by that, Mr. Dietrich? A. An organization of bolita has sellers and in the organization a pick-up man is one who goes around to the sellers and gathers up the sales of bolita and turns them in to the operator. Jack is the pick-up boy * * *.
"Mr. Branch: Just a moment. We move to strike that statement as a conclusion in the way of Jack here.
"Mr. Allgood: I intend to qualify him.
"The Court: I think so, you may say * * *.
"Mr. Branch: He said Jack is a pick-up man; that's a conclusion.
"The Court. I think so. Tell us why you said he was a pick-up man. A. He told us he was the pick-up boy for six houses.
* * * * * *
"Q. All right, Mr. Dietrich, were you in court yesterday? A. Yes, sir.
"Q. Mr. Lovick Adams to whom you referred just now in this conversation of this defendant, is that the person who was convicted here yesterday? A. Yes, sir.
"Mr. Branch: Your Honor please, object to the question and move to strike the answer because it is irrelevant and immaterial and prejudicial against this defendant as to what happened to Lovick Adams yesterday.
"The Court: I see nothing prejudicial in it.
"Mr. Allgood: You may inquire."
The appellant seriously contends that the reference to Adams as being the person who was convicted the day before was error and extremely prejudicial.
We cannot take one particular statement of the witness and say that it is error and extremely prejudicial without considering such statement in connection with all other testimony of this witness. It appears from the other testimony that the appellant hesitated about telling the truth because he *849 was afraid of Mr. Adams. He did testify that he had been working for Mr. Adams a long time. The appellant admitted that he had worked as a pick-up man for Mr. Adams for at least six places, and that he checked in with Mr. Adams at various places, but mostly at First Avenue South at approximately 17th Street. Appellant admitted that Mr. Adams would meet him at a designated place and he would get the money from Mr. Adams and he, the appellant, would pay off.
Under the facts shown in this case if it was error for the witness to identify Mr. Adams as the man who had been convicted the day before, it was not harmful and was not prejudicial in any manner to the appellant. F.S. § 924.33, F.S.A. The evidence of his activities and his admissions were such that the jury could come to no other conclusion than that he was guilty.
We have carefully considered each of the assignments in this case and find that each of them is without merit.
Affirmed.
ROBERTS, C.J., and DREW, J., and PARKS, Associate Justice, concur.